894 So.2d 1229 (2005)
Ralph ABRAHAM, M.D., et al., Plaintiffs-Appellees
v.
RICHLAND PARISH HOSPITAL SERVICE DISTRICT 1-B, et al., Defendants-Appellants.
No. 39,841-CA.
Court of Appeal of Louisiana, Second Circuit.
February 8, 2005.
*1231 Stanley, Flanagan & Reuter, L.L.C., by Thomas Flanagan, William M. Ross, W. Raley Alford, III, Richard C. Stanley, Thomas P. Owen, New Orleans, for Appellants, SEC/EmCare and Robert Maddox, M.D.
Hudson, Potts & Bernstein, by Jan P. Christiansen, Gordon L. James, Monroe, for Appellants, Richland Parish Hospital Service and David Kerwin.
Ward & Condrey, L.L.C., by Joseph R. Ward, Jr., Covington, for Appellees.
Gregory Scott Moore, Monroe, for Appellee, Ralph Abraham, M.D.
Mason Oswalt, Monroe, for Appellee, Randy W. Head, M.D.
McLeod Verlander, by David E. Verlander, III, Monroe, for Appellee, Ron Morgan, M.D.
Before WILLIAMS, GASKINS and DREW, JJ.
GASKINS, J.
The defendants appeal from the trial court's denial of their motions for partial summary judgment in which they sought the dismissal of the anti-trust claims brought by the plaintiff doctors. We affirm.

FACTS
On September 30, 2002, the instant suit was filed by Dr. Ralph Abraham, Dr. Randy Head, and Dr. Ron Morgan, who are general or family practitioners in northeast Louisiana. Named as defendants were Richland Parish Hospital Service District 1-B d/b/a Richardson Medical Center ("the hospital"); David Kervin, the hospital's administrator; SEC/EmCare Emergency Care, Inc. ["Emergency Care (Spectrum)"], which provided emergency room (ER) doctors for the hospital; and Dr. Robert Maddox, an ER doctor employed by Emergency Care (Spectrum). In their petition, the plaintiffs assert violations of the Louisiana antitrust laws, the Louisiana Unfair Trade Practices Act, and contract laws, as well as allegations of defamation and detrimental reliance.
The plaintiffs alleged that the hospital offered Dr. Morgan a recruiting contract in 1992 to run a clinic it owned in Mangham; it leased the facilities to him. In 1995, Dr. Abraham and Dr. Head joined Dr. Morgan. The hospital offered them recruitment contracts guaranteeing them an annual income of $100,000, reimbursement of up to $8,000 in monthly expenses, and assistance in purchasing and maintaining a computer system. In late 1995, the plaintiffs opened a satellite clinic in Rayville which supposedly challenged the hospital's Rayville clinic, the Northeast Louisiana Rural Health Clinic (NELRHC), in the Rayville primary care market. Also, the plaintiffs began admitting some patients to St. Francis Hospital in Monroe. According to the petition, the hospital retaliated by ceasing payments under the recruitment contracts and accelerating the rent payments under the clinic lease in 1996. Also, Dr. Maddox allegedly refused or delayed medical treatment to the plaintiffs' patients when they presented at the hospital's ER. Dr. Head left the practice in 1996; in 1997, the other two doctors closed their Rayville clinic. They later dissolved their joint practice in Mangham.
*1232 The only matters before this court now are the antitrust issues. The defendants filed motions for partial summary judgment seeking dismissal of the antitrust claims. In their petition, the plaintiffs asserted that the defendants' conduct constituted a conspiracy "to unfairly restrain trade in the Mangham-Rayville area." They contended that the defendants' conduct "constitutes an attempt to monopolize the practice of medicine in the Mangham-Rayville area, particularly with regard to the examination of patients in the emergency room of the Hospital, the leveraging of an essential facility (the ER) to require admissions at Richardson Medical Center, and the practice of primary care medicine."
In their motions, the defendants challenged the viability of the anti-trust claims for two reasons, only one of which is pertinent in these proceedings. Specifically, they claimed that the plaintiffs failed to properly define relevant geographic markets and to show that the defendants possessed market power in the relevant geographic markets.
In opposition to the motions for partial summary judgment, the plaintiffs offered the affidavit of Dr. Frank Gollop, a Harvard-educated economist from Boston College.
The trial court denied the motions for partial summary judgment, finding that the definitions of the relevant markets were triable issues.
The defendants appeal, arguing a narrow issue of law, i.e., the plaintiffs failed to define the geographic markets for primary care medicine or for hospital services.[1] Specifically, they assert that the plaintiffs failed to show "not just where consumers currently purchase the product, but where consumers could turn for alternative products or sources of the product" if a competitor raised prices, lowered quality, or reduced output.

LAW

Summary Judgment
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991); Costello v. Hardy, XXXX-XXXX (La.1/21/04), 864 So.2d 129.
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of actions. La. C.C.P. art. 966(A)(2). A court must grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(B).
Summary judgment procedure is now favored under our law. La. C.C.P. art. 966(A)(2). In antitrust cases, summary *1233 judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces. PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101 (2nd Cir.2002).
Expert opinion testimony in the form of an affidavit or deposition may be submitted in support of or opposition to a motion for summary judgment. La. C.C.P. art. 967; Independent Fire Ins. Co. v. Sunbeam Corp., 1999-2181 (La.2/29/00), 755 So.2d 226. La. C.E. art. 702 governs the admissibility of expert testimony:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Before an expert's testimony is admitted, the trial court is required to perform a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This "gatekeeping" obligation applies not only to "scientific" testimony, but to all expert testimony. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Daubert nonexclusive list of factors includes:
(1) the "testability" of the scientific theory or technique;
(2) whether the theory or technique has been subjected to peer review and publication;
(3) the known or potential rate of error; and
(4) whether the methodology is generally accepted in the scientific community.
Daubert was adopted in Louisiana in State v. Foret, 628 So.2d 1116 (La.1993). In Cheairs v. State ex rel. Department of Transp. and Development, XXXX-XXXX (La.12/3/03), 861 So.2d 536, the court further specified that admission of expert testimony is proper only if all three of the following things are true:
(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.
When the party opposing the summary judgment motion submits expert opinion evidence that would be admissible and that is sufficient to allow a reasonable juror to conclude the expert's opinion on a material fact more likely than not is true, the court should deny the summary judgment motion. Willis v. Medders, 2000-2507 (La.12/8/00), 775 So.2d 1049; Independent Fire Ins. Co. v. Sunbeam Corp., supra.

Antitrust/Monopoly
Louisiana's antitrust legislation prohibiting trusts and conspiracies in restraint of trade and forbidding monopolies was passed in 1890, the same year the federal Sherman Antitrust Act was enacted. Reppond v. City of Denham Springs, 572 So.2d 224 (La.App. 1st Cir.1990).
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal. La. R.S. 51:122. A claim under La. R.S. 51:122 must include an allegation of damage to competition. *1234 Plaquemine Marine, Inc. v. Mercury Marine, XXXX-XXXX (La.App. 1st Cir.7/25/03), 859 So.2d 110.
No person shall monopolize, or attempt to monopolize, or combine, or conspire with any other person to monopolize any part of the trade or commerce within this state. La. R.S. 51:123. To establish a cause of action for monopoly, the pleadings must state facts sufficient to show that the defendant: (1) possessed monopoly power in a clearly defined economic and geographic market (the relevant market), and (2) that the defendant had the specific purpose or intent to exercise or maintain that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. Plaquemine Marine, Inc. v. Mercury Marine, supra.
The relevant market is the area of effective competition within which the defendant operates. It includes a geographic market, which is the section of the country in which sellers of a particular product operate, as well as the product market, which encompasses the differences among various commodities and the willingness of buyers to substitute one product for another. Plaquemine Marine, Inc. v. Mercury Marine, supra; Southern Tool & Supply, Inc. v. Beerman Precision, Inc., XXXX-XXXX (La.App. 4th Cir. 11/26/03), 862 So.2d 271, writs denied, XXXX-XXXX (La.3/12/04), 869 So.2d 821, XXXX-XXXX (La.3/12/04), 869 So.2d 825, XXXX-XXXX (La.3/12/04), 869 So.2d 826.
The geographic element consists of the "area in which sellers of the defendant's product operate, and to which buyers can practicably turn to obtain that product." State ex rel. Ieyoub v. Racetrac Petroleum, Inc., XXXX-XXXX (La.App. 3d Cir.6/20/01), 790 So.2d 673.
Failure to define the market in which the monopoly is allegedly exercised is fatal to a monopolization claim. State ex rel. Ieyoub v. Racetrac Petroleum, Inc., supra; Plaquemine Marine, Inc. v. Mercury Marine, supra.

DISCUSSION
In its detailed written opinion, the trial court found that Dr. Gollop's affidavits met all of the Daubert and Cheairs requirements. Among other things, the court noted his testimony would assist the trier of fact in understanding the evidence. The trial court also noted the absence of contradictory expert evidence challenging Dr. Gollop's qualifications or methodology.
In his affidavits, Dr. Gollop defined three relevant geographic markets: the ER services market, the hospital service market, and the primary care medicine market. He concluded that the ER care at the hospital was a monopoly within that geographic area because people requiring medical care typically travel to the nearest full-service ER.
In its opinion, the trial court found that this market was adequately defined as Rayville, Mangham, Start, Archibald and, Alto for antitrust purposes. In brief and at oral argument, the appellants did not appear to contest this finding.
The second geographic market, hospital services, was deemed by Dr. Gollop to be generally broader than the ER market because "[n]either time nor distance is the sole criterion for choice." Also, patients "typically seek service at the hospitals recommended by their physicians." Dr. Gollop opined that the relevant antitrust market for hospital services included hospitals within a "reasonable distance" from Rayville, i.e., the geographic area within which primary care physicians in Rayville can reasonably make hospital calls on their patients. According to Dr. Gollop, this *1235 includes St. Francis Hospital, North Monroe Hospital and "perhaps" Glenwood Regional Medical Center in Monroe, in addition to the defendant hospital in Rayville. In his supplemental affidavit, he stated that "where consumers of hospital services do go is indicative of where they would go if hospital fees were raised." He reasoned that patients with insurance are not price sensitive because they are liable only for copays and deductibles. The trial court concluded that this market was also adequately defined for purposes of the motions for partial summary judgment. However, based upon the plaintiffs' deposition testimony about the residences of their patients, the court found that at trial the area might be expanded to include Richland, Franklin, and Ouachita parishes. Still, the court concluded that the definition of this market was a "triable issue." According to the appellants, the hospital services geographic market is linked to the third market.
The third geographic market is primary care medicine. In his original affidavit, Dr. Gollop wrote that this market is "relatively local" and that "patients typically affiliate with doctors in their local community for well-visits and routine non-specialized care." Rayville residents typically see Rayville doctors, and Mangham residents see Mangham doctors. Although some Mangham residents might travel to Rayville, a larger city, for primary care, Dr. Gollop felt it was unlikely that Rayville residents would travel to Mangham. However, he noted that with the exception of some Rayville residents who established relationships with the plaintiffs while they had their Rayville clinic, Rayville residents generally do not seek primary care in Mangham. Thus, he concluded that the Rayville and Mangham primary care services constituted separate antitrust markets. In his supplemental affidavit, Dr. Gollop emphasized that the important factor here was where the Rayville residents, not residents of Mangham or rural areas, go for care. As to determining the antitrust issue of where consumers could turn for alternative products if a competitor raised prices, he again stated that any price sensitivity test as to physician substitution was mooted by third-party payors such as insurers. He reiterated that where "consumers go indicates the geographic boundaries of where they could practicably go if prices were to increase." The trial court concluded that this market also appeared to be adequately defined for summary judgment purposes. Again, the court noted that trial evidence might cause the definition to be expanded to Richland, Franklin, and Ouachita parishes; thus, the matter was a triable issue not suitable for summary judgment.
The defendants argue that the deposition testimony shows that the plaintiffs have too narrowly drawn the primary care medicine market  that Rayville residents are not limited to Rayville doctors for basic medical care.
The trial court stated that the plaintiffs had survived summary judgment on this matter because reasonable persons could disagree on the definitions of the markets and Dr. Gollop's uncontradicted expert opinion provided a basis for the definitions. We agree. For purposes of summary judgment, we find that the plaintiffs have adequately defined the markets, primarily through the competent and reasonable expert testimony of Dr. Gollop. To the extent that the depositions of some of the plaintiffs' witnesses presented conflicting evidence, these are matters which must be resolved at trial on the merits.
We conclude that it is premature to draw conclusions as a matter of law at this point, and the trial court correctly denied *1236 the defendants' motions for summary judgment as to the antitrust issues.

CONCLUSION
The judgment of the trial court denying partial summary judgment is affirmed. Costs are assessed against the appellants.
AFFIRMED.
NOTES
[1] This appeal was expedited pursuant to La. R.S. 51:135 which requires determination of the appeal within 20 days after lodging at the appellate court.

During this quickly paced appeal, this court was aided in its decision-making process by not only a well written and extensively researched trial court opinion but also by the excellent work of counsel for both sides. In particular, we note the exemplary professionalism of counsel  appellants' counsel in advising opposing counsel of the narrowness of its issue on appeal in order to facilitate the appellate process and appellees' counsel in acknowledging this action and drawing our attention to it both in brief and at oral argument. Such gracious courtesy among opposing counsels is to be highly commended.