938 So.2d 1163 (2006)
Ralph ABRAHAM, M.D., Randy W. Head, M.D., and Ron Morgan, M.D., Plaintiff-Appellant
v.
RICHLAND PARISH HOSPITAL SERVICE DISTRICT 1-B d/b/a Richland Medical Center, David Kervin, Robert Maddox, M.D., and SEC/EmCare Emergency Care, Inc., Defendant-Appellee.
No. 41,141-CA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 2006.
Rehearing Denied September 21, 2006.
*1165 Joseph R. Ward, Jr., Covington, Gregory Scott Moore, Mason L. Oswalt, for Ralph Abraham, M.D. and Randy W. Head, M.D.
David E. Verlander, III, Monroe, Joseph R. Ward, Jr., Covington, for Ron Morgan, M.D.
Gordon L. James, Monroe, Jan Peter Christiansen, Monroe, for Richland Parish Hospital Service District 1-B and David Kervin.
Thomas More Flanagan, New Orleans, for Robert Maddox, M.D. and SEC/EmCare Emergency Care, Inc.
Before STEWART, GASKINS and DREW, JJ.
DREW, J.
In this lawsuit, Drs. Ralph Abraham, Randy Head, and Ron Morgan ("plaintiffs") asserted that defendants violated Louisiana law by conspiring to restrain trade in violation of La. R.S. 51:122, and conspiring to monopolize in violation of La. R.S. 51:123. Among plaintiffs' other claims is that defendants violated Louisiana's Unfair Trade Practices laws. However, the antitrust claims of restraint of trade and monopoly are the only causes of action at issue in this appeal of the granting of defendant's renewed motion for partial summary judgment. We affirm.

FACTS
In 1992, the Richland Parish Hospital Service District 1-B d/b/a Richardson Medical Center ("Hospital") contracted with Dr. Ron Morgan to run a clinic it owned in Mangham. This clinic was leased to Dr. Morgan. In 1995, Dr. Ralph Abraham and Dr. Randy Head joined Dr. Morgan at the Clinic. The Hospital offered plaintiffs, who are family and general practitioners, contracts guaranteeing each an annual income of $100,000, reimbursement of up to $8,000 in monthly expenses, and assistance in purchasing and maintaining a computer system.
In late 1995, the plaintiffs opened a satellite clinic in Rayville[1] which supposedly *1166 challenged the hospital's Rayville clinic, the Northeast Louisiana Rural Health Clinic (NELRHC), in the Rayville primary care market. Also, the plaintiffs began admitting some patients to St. Francis Hospital in Monroe. Plaintiffs contend that in 1996, the hospital retaliated by ceasing payments to Drs. Abraham and Head, and by accelerating the rent payments under the clinic lease. They also contend that when their patients went to the emergency room at the Hospital, Dr. Robert Maddox, an emergency room physician, not only refused or delayed medical treatment to the plaintiffs' patients, but also attempted to have their patients choose other physicians. Dr. Head left the practice in 1996 and moved his office to Monroe, and in 1997, the other two plaintiffs closed their Rayville clinic. They later dissolved their joint practice in Mangham, but continued to practice separately there.
On September 30, 2002, plaintiffs filed suit against the Hospital; David Kervin, the hospital's administrator; SEC/EmCare Emergency Care, Inc. ("Spectrum"), which provided emergency room doctors to the hospital; and Dr. Maddox, who was employed by Spectrum. In their petition, the plaintiffs asserted violations of the Louisiana antitrust laws and the Louisiana Unfair Trade Practices Act, and alleged that defendants breached their contracts and made libelous statements against them.[2] Regarding the antitrust claims, plaintiffs contended in their petition that the defendants' conduct constituted "a conspiracy to unfairly restrain trade in the Mangham-Rayville area[.]" They complained that the defendants' conduct was "an attempt to monopolize the practice of medicine in the Mangham-Rayville area, particularly with regard to the examination of patients in the emergency room of the Hospital, the leveraging of an essential facility (the ER) to require admissions at [the Hospital], and the practice of primary care medicine."
The defendants filed motions for partial summary judgment seeking dismissal of the antitrust claims. In their motions, the defendants asserted that the plaintiffs failed to properly define the relevant geographic markets and to show that the defendants possessed market power in the relevant geographic markets. In opposition to the motions for partial summary judgment, the plaintiffs offered the affidavit of economist Dr. Frank Gollop.[3] The trial court denied the motions for partial summary judgment, finding that the definitions of the relevant markets were triable issues.
The defendants appealed, arguing only that the plaintiffs had failed to define the geographic markets for primary care medicine or for hospital services. This court affirmed the denial of the motions for summary judgment. Abraham v. Richland Parish Hosp. Service Dist. 1-B, 39,841 (La.App. 2d Cir.2/8/05), 894 So.2d 1229, writ denied, XXXX-XXXX (La.4/22/05), 899 So.2d 571.
In affirming the denial of the motion, this court explained that Dr. Gollop had *1167 adequately defined the relevant market for primary care services:
The third geographic market is primary care medicine. In his original affidavit, Dr. Gollop wrote that this market is "relatively local" and that "patients typically affiliate with doctors in their local community for well-visits and routine non-specialized care." Rayville residents typically see Rayville doctors, and Mangham residents see Mangham doctors. Although some Mangham residents might travel to Rayville, a larger city, for primary care, Dr. Gollop felt it was unlikely that Rayville residents would travel to Mangham. However, he noted that with the exception of some Rayville residents who established relationships with the plaintiffs while they had their Rayville clinic, Rayville residents generally do not seek primary care in Mangham. Thus, he concluded that the Rayville and Mangham primary care services constituted separate antitrust markets. In his supplemental affidavit, Dr. Gollop emphasized that the important factor here was where the Rayville residents, not residents of Mangham or rural areas, go for care. As to determining the antitrust issue of where consumers could turn for alternative products if a competitor raised prices, he again stated that any price sensitivity test as to physician substitution was mooted by third-party payors such as insurers. He reiterated that where "consumers go indicates the geographic boundaries of where they could practicably go if prices were to increase." The trial court concluded that this market also appeared to be adequately defined for summary judgment purposes. Again, the court noted that trial evidence might cause the definition to be expanded to Richland, Franklin, and Ouachita parishes; thus, the matter was a triable issue not suitable for summary judgment.
The defendants argue that the deposition testimony shows that the plaintiffs have too narrowly drawn the primary care medicine market-that Rayville residents are not limited to Rayville doctors for basic medical care.
The trial court stated that the plaintiffs had survived summary judgment on this matter because reasonable persons could disagree on the definitions of the markets and Dr. Gollop's uncontradicted expert opinion provided a basis for the definitions. We agree. For purposes of summary judgment, we find that the plaintiffs have adequately defined the markets, primarily through the competent and reasonable expert testimony of Dr. Gollop. To the extent that the depositions of some of the plaintiffs' witnesses presented conflicting evidence, these are matters which must be resolved at trial on the merits.
Abraham, 894 So.2d at 1235.
Subsequently armed with patient statistics and an opinion from their own expert, the defendants reurged the motion for partial summary judgment on the antitrust claims, but only on the narrow question of whether Rayville is a separate and independent market for primary care medicine. They contended that Dr. Gollop's opinion that Rayville and Mangham were separate antitrust markets had since been shown to be incorrect based upon documents, particularly patient lists, produced by the plaintiffs. According to defendants, these patient lists showed that each plaintiff treated a substantial number of Rayville patients at their offices outside of Rayville. The defendants added that Drs. Abraham and Morgan's records demonstrated that they regularly saw patients in Mangham from not only Rayville and Mangham, but also from Monroe, Winnsboro, *1168 and Delhi, and that Rayville residents made up between 24-31% of the new patients for each Mangham plaintiff. Defendants argued that because the plaintiffs had improperly defined the market for primary care, their antitrust claims must fall.
A hearing on defendants' motion for partial summary judgment was held in October of 2005. In granting the motion, the trial court stated:
Defendants argue that Dr. Gollop's analysis is severely flawed because his 2005 deposition revealed that the relevant market for this litigation should be confined to the corporate limits of Rayville even though the NELHRC draws most of its patients from the entire Rayville zip code which extends well beyond the corporate limits of the town of Rayville and the fact that the Rayville doctors compete directly with Mangham and Monroe doctors for the same pool of patients.
Defendants have submitted expert opinion from Dr. William Lynk who determined that at a minimum the Rayville and Mangham communities are in the same geographic market for primary-care medicine. Also, the report of pollster, John Grimm, would lead one to believe that the Town of Rayville is not an independent market.
Plaintiffs counter that Dr. Gollop is correct and that the geographic market for medical services can be smaller than the defendant's service area citing a couple of federal cases to support their position. Also, plaintiffs contend that defendants and their expert, Dr. Lynk, have misused the patients' address data supplied to them by incorrectly assuming that anyone with the 71269 zip code resides in the Town of Rayville.
* * *
The first inquiry under the Surgical Care decision is to determine the product and service area in which the NELHRC attracts the substantial majority of its business. That service area, from the record, extends throughout the 71269 zip code and beyond. The second step under Surgical Care is to determine the geographical locations of other primary-care doctors that also serve a substantial number of the patients in that same medical service area. The plaintiff doctors have confirmed in their depositions that a significant number of the residents in the 71269 zip code area visit them in Mangham and in Monroe. Consequently, Doctors Abraham, Morgan, and Head compete with the doctors in Rayville for the same patient base. Yet, Dr. Gollop states that in his opinion few residents of the Town of Rayville receive primary care from doctors outside of Rayville.
The jurisprudence on this subject indicates that, in defining an antitrust market, the plaintiff is required to show where consumers could go beyond the service area in response to anti-competitive conduct. After reviewing the record, this court finds that there is too much inflow of patients from outside the Town of Rayville to the medical providers there and too much outflow of the patients living in Rayville to medical providers in Mangham and elsewhere to classify the Town of Rayville as a separate geographic market. It appears that at a minimum the relevant geographic market must be at least as large as the NELHRC's service area. Even plaintiffs' petition states that there was a conspiracy to restrain trade in the Mangham-Rayville area. Because Mangham and Rayville are not separate markets, the plaintiffs' antitrust claims must be dismissed. . . . This court finds based on the record that there is no *1169 question of fact that physicians in the Towns of Rayville and Mangham compete with one another for patients residing in the 71269 zip code and beyond. This court has rejected Dr. Gollop's contrary conclusions as a matter of law because his methodology in determining the relevant geographic market is flawed since it is not based on the data and the testimony made available in the record of these proceedings and since his conclusions do not meet with the guidelines in determining relevant geographic markets as defined in the jurisprudence.

DISCUSSION
La. R.S. 51:122(A) states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal." A claim under this statute must include an allegation of damage to competition. Plaquemine Marine, Inc. v. Mercury Marine, XXXX-XXXX (La.App. 1st Cir.7/25/03), 859 So.2d 110.
La. R.S. 51:123 prohibits a person from monopolizing or attempting to monopolize, or combining, or conspiring with any other person to monopolize any part of the trade or commerce within Louisiana. In order to establish a cause of action for monopoly, the pleadings must state facts sufficient to show that defendant (1) possessed monopoly power in a clearly defined economic and geographic market (the relevant market) and, (2) that defendant had the specific purpose or intent to exercise or maintain that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. Plaquemine Marine, Inc. v. Mercury Marine, supra.
Dr. Gollop believes that the Town of Rayville is the relevant market, or submarket as he sometimes refers to it, for primary care services in this case. The relevant market is defined as the area of effective competition within which the defendant operates. It includes a geographic market as well as a product market. The geographic market is the section of the country in which sellers of a particular product operate. The product market encompasses the differences among various commodities and the willingness of buyers to substitute one product for another. Plaquemine Marine, supra; Abraham, supra. The geographic element consists of the area where sellers of the defendant's product operate, and to where buyers can practicably turn to obtain that product. Id.
In reurging their motion for summary judgment, the defendants contended that the court had been misled by Dr. Gollop, who reported that few Rayville residents would be expected to travel to Mangham for primary care. After the denial of the first motion for summary judgment, defendants gathered and analyzed information about where patients lived, deposed Dr. Gollop, presented an opinion from their own expert, and commissioned a survey of Rayville residents.
Defendants discovered that the plaintiffs treat a substantial number of residents of the Rayville ZIP Code at offices in Mangham and Monroe. A legal assistant for one of defendants' attorneys had examined plaintiffs' patient records and calculated that:
 From July 1997 to 2005, 30.76% of the patients who registered at Dr. Abraham's Mangham clinic were from the Rayville ZIP Code.
 From January 2003 to 2005, 23.87% of the patients who registered at Dr. Morgan's Mangham clinic came from the Rayville ZIP Code.

*1170  From July 1997 to 2005, Dr. Head registered 500 patients from the Rayville ZIP Code at his office in Monroe.
Defendants contend that this information shows that Rayville residents will travel outside of Rayville for primary medical care.
In further support of their argument that Rayville is within a larger geographic market, defendants point to deposition testimony from various physicians, including plaintiffs, who practice or had practiced in Rayville. Dr. Morgan stated in his deposition that he considered doctors in Rayville to be his competitors. Dr. Abraham testified that any other family doctor within 20 miles of Mangham would be his competition.[4] Dr. Albert Kerr estimated that 10% of his patients in Rayville come from Monroe. Dr. Dan Lafleur stated that he has patients come from as far as Tallulah to see him in Rayville. Dr. David Thompson stated that he has a fair Delhi clientele at his Rayville office. Dr. Ron Hubbard testified that when he moved from Rayville, he turned over a lot of his patients to Dr. Ron Morgan and Dr. Charles Morgan in Monroe. Dr. Charles Krin thought it would be impossible to monopolize the market for primary care medicine in Richland Parish because there were two hospitals and two different groups of doctors in the area, as well as a large number of family practice doctors in Monroe. Dr. Krin, who has a family practice in the Rayville area, estimated that he draws patients from a seven-parish area.
To counter Dr. Gollop's definition of the relevant market for primary care services, defendants offered the opinion of Dr. William Lynk, who is the Senior Vice-President and Senior Economist at Lexecon, an economic consulting firm in Chicago, where he specializes in health economics. Prior to joining Lexecon, Dr. Lynk was Director of the Health Economics Research Department at the national Blue Cross and Blue Shield Association, where he conducted and supervised economic research on health care market issues.
Dr. Lynk noted that there were around seven primary care doctors who practiced in and around Rayville. He also noted that the term "primary care" generally refers to the medical specialities of general practice, family practice, internal medicine, and pediatrics.
Dr. Lynk concluded that the relevant health economics research in general, and the empirical evidence in the case in particular, rejects the view that Rayville and Mangham are separate primary care geographic markets. Dr. Lynk found that, at a minimum, primary care physician practice sites in Rayville, Mangham, and Monroe are within the same relevant geographic market, and the plaintiffs have not been excluded from this market because they have moved around within it. Dr. Lynk particularly noted that although the Rayville clinic was closed by plaintiffs in October of 1997, the number of visits at their Mangham clinic rose enough within a few months to offset the loss of visits in Rayville. Dr. Lynk believed this implied that Rayville and Mangham were together in one primary care services market.
Both Dr. Gollop and Dr. Lynk follow the Surgical Care two-step test to define the relevant geographic market.[5] The two steps are:
(1) Determine the product and service area in which [defendant] attracts the *1171 substantial majority of its inpatient business; [and]
(2) determine the geographic locations of other [physicians] that also currently serve a substantial number of the patients residing in the [defendants'] service area. These other [physicians] are those competitors who have the ability to serve [defendants'] current patients should those patients choose to seek out alternative sources of [treatment.]
Surgical Care Center of Hammond, L.C. v. Hospital Service District No. 1 of Tangipahoa Parish, 2001 WL 8586 (E.D.La. 2001), affirmed, 309 F.3d 836 (5th Cir. 2002).
In step one, Dr. Lynk prefers using 90% to determine the product and service area of the health care provider at issue. In other words, he defines that provider's patient service area as the "narrowest area sufficient to account for 90 percent of its patient business." Dr. Lynk offers that the 90% statistical criterion has largely become the norm. Dr. Gollop prefers to use 70%.
Table 4 attached to Dr. Lynk's report lists statistics pertaining to patient registrations at the NELRHC from 2000 to 2005. This table shows that 72.08% of the clinic's patients were from the Rayville ZIP Code. Ranked second and third were Delhi and Monroe, which provided 5.47% and 3.83% of the patient registrations respectively. Using the 90% standard, one would have to add patients from Start (Richland Parish), Mangham, and Oak Ridge (Morehouse), as well as Delhi and Monroe, to the Rayville ZIP Code patients in order to collectively come close to the 90% plateau. Thus, using the 90% standard, the defendants' service area in the field of primary care services encompasses an area larger than the Rayville ZIP Code area, an area obviously larger than merely the town limits of Rayville. Dr. Gollop stated in his October 2005 report that he does not "have any issue with Dr. Lynx's use of a 90% criterion for determining the outer boundaries" of NELRHC's service area. In any event, even if the 70% standard is utilized, 72.08% of the NELRHC's patients came from the Rayville ZIP Code, not just from the Town of Rayville.
As for the second step, a telephone survey of 760 households in the Rayville ZIP Code that was conducted between March and May of 2005 showed that approximately 44% of respondents and members of their households used a primary care physician located in a place other than the Town of Rayville. Moreover, patient registration records from plaintiffs showed that the plaintiffs in Mangham and Monroe are an option for Rayville ZIP Code residents seeking primary care services. While obviously not all of these residents of this ZIP Code hail from Rayville proper, it is equally obvious that this group would include residents of the town itself.
Dr. Gollop counters that his analysis shows that of plaintiffs' new patients, only a small number are from the Town of Rayville, specifically 2.45% for Dr. Morgan, 3.32% for Dr. Abraham in 2004, and only 0.13% for Dr. Head in 2004. Dr. Gollop also criticizes Dr. Lynk for confusing the residents of the Rayville ZIP Code with the residents of the Town of Rayville alone. However, Dr. Gollop is missing the point. Step one established NELRHC's service area as being far beyond just the Town of Rayville; accordingly, step two examines the primary care options for patients throughout this service area, not just those who live within the corporate limits of the Town of Rayville.
Dr. Gollop contends that the application of the second step of the Surgical Care test in this case can actually decrease *1172 the size of the area determined in step one as the service area. This is incorrect. As noted by the district judge in Surgical Care, the second step of the geographic market analysis switched the focus from where does the defendant get its patients to where do patients who reside in the defendant's service area go for hospitalization if they do not go to the defendant. Moreover, the trial court noted that the definition of the relevant geographic market by Surgical Care's expert was improper as he did not perform step two of the test. "[T]he geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 726 (3rd Cir.1991), cert. denied, 505 U.S. 1221, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992). In terms of primary care services, Rayville is not an economically isolated market from Mangham as physicians in Mangham present an alternative for patients within NELRHC's service area.
Our de novo review of this record convinces us that summary judgment was properly granted in this case. Plaintiffs next argue that their restraint of trade claim remains viable because that claim does not contain the definition of a market as an element. This is incorrect. La. R.S. 51:122 is a counterpart to § 1 of the Sherman Anti-Trust Act. State ex rel. Ieyoub v. Bordens, Inc., 95-2655 (La.App. 4th Cir.11/27/96), 684 So.2d 1024, writ denied, 97-0339 (La.3/14/97), 690 So.2d 42. A claim under section 1 of the Sherman Act requires proof of three elements: that the defendant (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market. Spectators' Communication Network Inc. v. Colonial Country Club, 253 F.3d 215 (5th Cir.2001). In Surgical Care Center, the 5th Circuit noted that in order to show an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, plaintiff had "to prove that North Oaks engaged in concerted action that produced anticompetitive effects in the relevant markets. . . ." Surgical Care Center, 309 F.3d at 836.

DECREE
At appellants' costs, the judgment is AFFIRMED.
APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, GASKINS, DREW and MOORE, JJ.
Rehearing denied.
NOTES
[1] According to the 2000 census, the Town of Rayville has a population of 4,234, and the Rayville ZIP Code area has 12,655 residents. The Town of Rayville covers approximately 2.25 square miles.
[2] Plaintiffs had originally presented a federal antitrust claim, as well as state-law claims, in a suit in federal court. However, the federal court dismissed the federal antitrust claim on the grounds that the defendants were entitled to immunity from federal antitrust suits. Declining to exercise jurisdiction over the remaining state-law claims, the federal court dismissed those claims without prejudice.
[3] Dr. Gollop agreed that except for the present case, he had no experience determining the geographic market for primary care medicine.
[4] Rayville is approximately 12 miles north of Mangham.
[5] These are steps one and two of a three-step test used in Surgical Care to determine market power in a submarket.