UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-11453

_____


SPECTATORS' COMMUNICATION NETWORK
INC.; FRANK L. MITCHELL,          Plaintiffs - Appellants,

versus

COLONIAL COUNTRY CLUB; ET AL.,   Defendants,

ANHEUSER-BUSCH, INC.,            Defendant - Appellee.

_____

Appeal from the United States District Court for the
Northern District of Texas
_____


May 31, 2001

Before POLITZ, GIBSON,* and HIGGINBOTHAM, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Spectators' Communication Network and its owner, Frank Mitchell,[1] appeal from the summary judgment entered in favor of Anheuser-Busch, Inc., the only remaining defendant in their antitrust suit alleging that Spectators' was excluded from broadcasting professional golf tournaments. Spectators' contends

_____

*Circuit Judge of the Eighth Circuit, sitting by designation.

[1]We will refer to Spectators' and Mitchell collectively as Spectators'.

1

that the PGA and the other defendants organized a group boycott of Spectators' in order to put it out of business.  We conclude that Spectators' made an adequate showing of an antitrust conspiracy that makes economic sense.  Although Spectators' has not shown a horizontal boycott that would constitute a per se violation of the Sherman Act, it should be allowed the chance to prove its case under the rule of reason.  We therefore reverse the entry of summary judgment for Anheuser-Busch on Spectators's antitrust claim.  However, we  affirm the district court's entry of judgment for Anheuser-Busch on Spectators's state law claims.

Spectators' pioneered the use of on-site radio broadcasting at professional golf tournaments.  Because golf fans at a tournament can only see a small part of the action going on at any time, Spectators' began to report events taking place at other locations at the tournament.  Broadcasts were available only on the golf course and were transmitted through special low-frequency radios.  Spectators' made money by selling advertising rights for on-air commercials and for logos which were placed on the special radios.

The world of professional golf, in which Spectators' operates, consists of several tiers of interests that figure in this case.  At the top is the Professional Golf Association, or PGA, which controls the golfers through contracts that restrict the golfers from playing in non-PGA events if they wish to remain

on the PGA Tour.

The second tier of interests is composed of the sponsors, which in turn consist of two classes: "tournament sponsors," who organize and conduct the tournament as co-sponsors with the PGA, typically to raise money for local charities; and "corporate sponsors," who support the Tour tournaments financially in exchange for publicity. The sponsors were associated in an organization called American Golf Sponsors, which included NEC, K-Mart and Anheuser-Busch, all of whom were corporate sponsors of tournaments. Through a standard Sponsor Agreement, the PGA required the tournament sponsors to transfer all media rights, including television and radio broadcast rights, to the PGA and to give the PGA veto power over any radio broadcasting equipment that would be placed on the golf course.

The third tier of interests consists of Spectators' and its competitors in the on-site broadcasting business. Eventually, the PGA took over the on-site broadcasting niche itself, arranging to have the Tour events broadcast by Vanguard International, LLC, broadcasting as the "PGA Tour Radio Network."

Spectators' contends that the relevant market is the market for on-site advertising at golf tournaments. According to Spectators', this market is not interchangeable with other kinds of sports advertising because of the unusually desirable demographic characteristics of the people who attend golf

3

tournaments, in that the spectators are affluent, highly educated, and busy.

From 1986 to 1990, Spectators' dealt directly with the PGA, which reserved the right to "exercise extensive controls" and to charge Spectators' a fee for the privilege of broadcasting. Their relationship ended in 1990, and Spectators' sued the PGA. In the summer of 1991, the PGA gave Spectators' permission to enter broadcasting deals with the sponsors of individual tournaments. That fall Spectators' and Anheuser-Busch entered a contract for Spectators' to broadcast sporting events as the "Budweiser Spectators Network," which involved advertising Anheuser-Busch products on-air and putting Anheuser-Busch logos on the Spectators' radios at one golf tournament, a car race, and a tennis match. In November 1992, Anheuser-Busch confirmed by letter that it had agreed with Spectators' to sponsor the broadcast of seven unspecified events in 1993, with a formal contract to be drafted later. In April 1993, Anheuser-Busch and Spectators' entered a contract for advertising in connection with broadcasts at three golf tournaments: the K-Mart Greater Greensboro Open, the Anheuser-Busch Classic, and the NEC World Championship. Spectators' completed the first two broadcasts, but was unable to do the third because the sponsor, NEC, refused to permit Spectators' to broadcast from the golf course. Frank Mitchell, the owner of Spectators', testified in an affidavit that he learned from Barbara Burdick, an employee of NEC, that

4

NEC had "succumbed" to the PGA's requests not to allow Spectators' to broadcast the NEC tournament.  Similarly, Mitchell testified that in the fall of 1993, a representative of the K-Mart Greater Greensboro Open told him that the PGA would not allow the Greensboro tournament or other tournaments to let Spectators' broadcast at their tournaments.

Beginning in July 1993, Mitchell tape recorded several conversations with Anheuser-Busch's David Brunette in which Brunette said that Anheuser-Busch was under pressure from the PGA not to use Spectators':

> You know, so I don't know, I mean they [the PGA Tour] don't want to give you, they don't mind if we do them [on-site broadcasts,] but they don't want us using you. . . .

The gist of these conversations was that the PGA, and in particular, Gary Stevenson of the PGA, was hostile to Spectators' because of Spectators's lawsuit against the PGA and that the PGA would try to prevent Anheuser-Busch from working with Spectators'.  For instance, Brunette reported:

> [I]t's just that obviously, the PGA's just concerned about the fact that you know we're trying to deal with you and at the same time you're suing them.  It's something that they have to grant us.  We want to have the rights to do this and if they're not willing to grant us those rights, uh, you know, you've got somewhat of a battle if you start trying to do these things. . . .  I mean, they're just pretty adamant about the fact that they don't, they're not very happy with what's going on and they don't cherish the fact that we'd be working with you, but that still doesn't have anything to do with the fact that the funding is tight.

5

Spectators' contends that the PGA also made concessions in other aspects of its regulation of tournaments to persuade Anheuser-Busch not to deal with Spectators'. Spectators contends that the PGA previously had in place a "no alcohol" policy; though the extent of such a policy is unclear, at the least the PGA Commissioner limited the advertising of alcoholic products in connection with the Tour. On September 22, 1993, Anheuser-Busch representatives met with the PGA's Gary Stevenson and Leo McCullagh. They reached an agreement on an extensive program called the "Michelob 19th Hole" program, which involved Anheuser-Busch becoming a sponsor of the Tour Championship, advertising during golf events on television, using the PGA's logo in product promotions, and maintaining a "19th Hole" pavilion, a mobile exhibit that included substantial advertising at the tournament site. Shortly after this meeting, Anheuser-Busch wrote Spectators', cancelling the April 1993 contract.

Eventually, Anheuser-Busch's Michelob beer became the "official beer" of the PGA Tour.

Spectators' brought this suit against Colonial Country Club, NEC, K-Mart, American Golf Sponsors, Anheuser-Busch and the PGA Tour and its employee, Stevenson. The complaint alleged state commercial law and federal antitrust claims, in particular, that the defendants had engaged in a conspiracy to restrain trade in the market for professional golf tournament on-site advertising services.

6

Eventually, all the defendants except Anheuser-Busch were dismissed, either by the court or pursuant to agreements with the plaintiffs.  Anheuser-Busch moved for summary judgment, which the district court granted.  The court held that Spectators' failed to perform its obligation under the 1993 contract to broadcast the NEC tournament and therefore could not bring an action to enforce the  contract.  The court held that the plaintiffs' claim for civil conspiracy under Texas law failed for lack of evidence of conspiracy or any unlawful overt acts pursuant to the alleged conspiracy.  As for the antitrust conspiracy, the court rejected Spectators's group boycott theory.  The court held that the evidence did not show Anheuser-Busch had entered a combination with the intent to restrain competition in the market for advertising, and, in fact, such a claim would be nonsensical, since Anheuser-Busch would not rationally act to cause injury to purchasers of advertising, a class which includes Anheuser-Busch itself.  The court concluded that no anticompetitive combination was shown by evidence that PGA conditioned the 19th Hole package on Anheuser-Busch's discontinuation of business with Spectators':
"At best, Plaintiffs raise a fact issue regarding whether [Anheuser-Busch] decided not to engage in further business relations with [Spectators'] because it desired to engage in more lucrative business relations with others, and was concerned that its chances of securing the latter might be hampered by the former."(emphasis added).  The court held that Spectators'

7

evidence showed nothing more than competitive behavior by the defendants, and therefore Spectators' was injured by too much competition, not too little.


I.

We review the grant of summary judgment de novo. See Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Centers, Inc., 200 F.3d 307, 312 (5th Cir. 2000). Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to entry of judgment as a matter of law. See id. The party opposing the summary judgment motion must do more than show there is some metaphysical doubt as to the material facts. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Under section 1 of the Sherman Act, 15 U.S.C. § 1 (1994), the substantive law limits the range of permissible inferences from ambiguous evidence. See Matsushita, 475 U.S. at 588. In particular, courts will not draw inferences to support a claim that makes no economic sense; such a claim will require unusually persuasive evidence to withstand summary judgment. See id. at 587, 596-98. Rational economic actors do not ordinarily conspire to injure themselves.

Spectators' claims that the PGA combined with Anheuser-Busch and other tournament sponsors to freeze Spectators' out of the advertising market so that the PGA could appropriate Spectators's

8

business for itself. According to Spectators', the PGA accomplished this both by coercion and by enticement. The PGA could coerce the sponsors by invoking rights in its sponsorship contracts giving the PGA the power to control broadcasts of PGA Tour tournaments. The enticement took the form of changing the existing PGA policies about alcohol-related advertising so that Anheuser-Busch could purchase advertising opportunities, such as the 19th Hole program, directly from the PGA. According to Spectators', this concession was conditioned upon Anheuser-Busch not using Spectators' for on-site broadcasts.

A claim under section 1 of the Sherman Act requires proof of three elements: that the defendant (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market. See Stewart Glass, 200 F.3d at 312. To prove conspiracy or "concerted action," the plaintiff must prove that the conspirators had a "conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Serv. Corp, 465 U.S. 752, 768 (1984).

The district court held, and Anheuser-Busch argues, that there was not sufficient evidence of a combination or conspiracy, because it would have been irrational for Anheuser-Busch to conspire to restrain competition in a market in which it was a purchaser:

> As a consumer of on-site advertising at professional golf tournaments, [Anheuser-Busch] has no economic incentive to reduce competition in the market because doing so would bring about its own economic harm. "[A] theory of liability attributing irrationality to

9

> consumers does not get very far."  Indeed, where an
> antitrust claim simply makes no economic sense, more
> persuasive evidence is required than would otherwise be
> necessary.  Plaintiffs fail to provide such evidence.

Slip op. at 27-28 (internal citations omitted).

By reasoning that a consumer would never wish to bring about a restraint of trade in the market where it buys, the district court has ignored salient facts of this case:  Spectators' contends that Anheuser-Busch was both coerced and enticed to comply with the PGA's wishes.  Though in the abstract Anheuser-Busch would have nothing to gain from freezing a competitor out of the on-site broadcasting market, in the actual case at hand, Spectators' alleges that the PGA made it worth Anheuser-Busch's while to cooperate, by opening up the new opportunity to advertise through the 19th Hole exhibit and the designation of Michelob as the official beer of the PGA tournament on the condition that Anheuser-Busch not do business with Spectators'.  Additionally, Spectators' alleges that the PGA coerced Anheuser-Busch to boycott Spectators' by exercising its contractual power to control radio broadcasts of Tour events.

Antitrust law has never required identical motives among conspirators, and even reluctant participants have been held liable for conspiracy.  In United States v. Paramount Pictures, Inc., 334 U.S. 131, 161 (1948), the Supreme Court refused to distinguish between conspirators who fomented the conspiracy and those who only participated because they were coerced:

10

> There is some suggestion . . . that large exhibitors with whom defendants dealt fathered the illegal practices and forced them onto the defendants. But as the District Court observed, that circumstance if true does not help the defendants. For acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one.

The Supreme Court describes group boycotts as "joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or <u>persuading or coercing suppliers or customers to deny relationships</u> the competitors need in the competitive struggle." <u>Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.</u>, 472 U.S. 284, 294 (1985) (internal quotation omitted) (emphasis added). This description implicitly recognizes that an integral part of a boycott is often bringing pressure to bear ("persuading or coercing") on other participants who have no direct motive to restrain trade. Conspirators who are not competitors of the victim may have no interest in curtailing competition in a market in which they do not compete; nevertheless, when they have been enticed or coerced to share in an anticompetitive scheme, there is still a combination within the meaning of the Sherman Act.

The Third Circuit rejected the idea that parties to a conspiracy must share an identical anti-competitive motive in <u>Fineman v. Armstrong World Industries, Inc.</u>, 980 F.2d 171, 212 (3d Cir. 1992). The court held that where an otherwise disinterested party had some interest in the ringleader's economic success, the conspiracy could make economic sense. In <u>Fineman</u>, a flooring manufacturer, which wished to develop its own video program,

11

convinced a wholesaler not to deal with a company that developed a "video magazine" to be used as a sales aid in the flooring business. The video magazine company sued the manufacturer on a vertical boycott theory. The manufacturer argued that there was no illegal combination because the wholesaler did not compete with the video magazine company and therefore had no interest in eliminating it as a competitor of the manufacturer. The district court granted the manufacturer a directed verdict on this theory. The Third Circuit reversed, saying:

> We conclude that the district court's novel approach is misplaced as it renders section 1 claims unavailable to private litigants suffering antitrust injury as a result of concerted action in a vertical matrix. Such a restrictive rule fails to recognize the difference between motive and objective and would dramatically alter the antitrust landscape in a manner unjustified by either precedent or policy considerations. . . . A rational factfinder could infer agreement with the objective from knowledge of the objective and action calculated to achieve the objective despite differing motives.

Id. at 212. Although the wholesaler did not act from the same motive as the manufacturer, that did not mean that it had no motive to conspire. Rather, its motive derived from its relationship with the manufacturer: "Because [the wholesaler] relied upon sales of [the manufacturer's] products for 90 percent of its gross revenues, however, it would naturally perceive that that which is in [the manufacturer's] interest also inures to [the wholesaler's own] benefit." Id. at 212-13. Accord Full Draw Productions v. Easton Sports, Inc., 182 F.3d 745, 751 (10th Cir. 1999) (boycott by customers against supplier could make economic sense because

12

customers controlled competing supplier).

Another way a ringleader can persuade a vertically aligned actor to boycott the ringleader's competitor is by coercion. In MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc., 62 F.3d 967 (7th Cir. 1995), two exhibition contractors refused to rent equipment from MCM because of "threats of labor disruption by a union official in cahoots with the would-be monopolist," id. at 972, a competitor of MCM. The effect of the exhibitors' acquiescence to the coercion was to raise the price they had to pay for the equipment, obviously not a result they would have chosen in the absence of the threat. See id. at 971. MCM sued the exhibitors for participating in a vertical boycott. The exhibitors argued in their defense that they had only participated because of coercion. The Seventh Circuit rejected the coercion defense, concluding that "the 'combination or conspiracy' element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion." Id. at 973. "So long as defendants knew that they were acquiescing in conduct that was in all likelihood unlawful, we have no difficulty concluding that they thereby joined a combination or conspiracy for which they can be held accountable under section 1." Id. at 975.

The Tenth Circuit applied similar reasoning to a tying case in Systemcare, Inc. v. Wang Laboratories Corp., 117 F.3d 1137 (10th Cir. 1997) (en banc). There, the court held that a combination

13

arose when a buyer made a coerced purchase forced on it by a seller engaged in tying.  Judge Tacha reasoned that when a buyer accedes to the anticompetitive demands of a seller foisting an unwanted product on him, it deprives the market of "independent centers of decisionmaking," which is just what the concerted action requirement of section 1 exists to prevent.  Id. at 1143.  Accord Datagate, Inc. v. Hewlett-Packard Co., 60 F.3d 1421, 1426-27 (9th Cir. 1995); Will v. Comprehensive Accounting Corp., 776 F.2d 665, 670 (7th Cir. 1985).

Applying these precedents, we conclude that there can be sufficient evidence of a combination or conspiracy when one conspirator lacks a direct interest in precluding competition, but is enticed or coerced into knowingly curtailing competition by another conspirator who has an anticompetitive motive.  So even though it was not directly in Anheuser-Busch's interest to eliminate competition in the market for on-site advertising at tournaments, other facts in this record made it economically plausible for Anheuser-Busch to participate in a combination fomented by the PGA.

Accordingly, the district court erred when it held that Spectators' had not shown concerted action because its allegations were not economically plausible.

## II.

Even though Spectators' has established a case for concerted

14

action, the question remains whether the combination alleged was a restraint of trade, or more precisely, an unreasonable restraint of trade.  See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 289 (1985).  If Spectators' cannot prove an unreasonable restraint of trade, it would be futile for us to remand the antitrust claim.

We assess whether a combination restrains trade unreasonably by use of the "rule of reason," weighing all the circumstances of the case, see Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 723 (1988), unless the combination falls within one of the categories of per se unreasonableness--conduct so pernicious and devoid of redeeming virtue that it is condemned without inquiry into the effect on the market in the particular case at hand.  See Northwest Stationers, 472 U.S. at 289.

Spectators' characterizes the combination as a "group boycott" that was per se illegal.  Some group boycotts fall into the category of per se section 1 violations, but not all.  "Exactly what types of activity fall within the forbidden category is . . . far from certain.  '[T]here is more confusion about the scope and operation of the per se rule against group boycotts than in reference to any other aspect of the per se doctrine.'"  Id. at 294 (quoting L. Sullivan, Law of Antitrust 229-30 (1977)).

Although the distinction between boycotts that are per se illegal and those judged by the rule of reason is often a vexing

15

one, one rule is clear: only horizontal[2] boycotts can be per se violations of the Sherman Act. "[A]ntitrust law does not permit the application of the per se rule in the boycott context in the absence of a horizontal agreement, though in other contexts, say vertical price fixing, conduct may fall within the scope of a per se rule not at issue here." NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 138 (1998); accord Sharp, 485 U.S. at 735-36 (vertical restraint not per se illegal unless it includes agreement on price or price levels). Thus, in order to bring its boycott claim within the per se rule, Spectators' must point to a horizontal conspiracy, in other words, a conspiracy between competitors, rather than a vertical conspiracy between firms at different levels of distribution. See Sharp Electronics, 485 U.S. at 730 and n.4 (explaining distinction between horizontal agreement and vertical agreement with horizontal effects); Nova Designs, Inc. v. Scuba Retailers Ass'n, 202 F.3d 1088, 1092 (9th Cir. 2000) (where only parties to agreement are not competitors of each other, no horizontal boycott).

To make a per se case, the horizontal agreement need not be between competitors of the victim. In Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207 (1959), a boycott arranged by a

---

[2]"Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 730 (1988).

16

single competitor of the victim retailer, but carried out by a "wide combination" consisting of manufacturers and distributors, as well as the competing retailer, led to per se liability.  Id. at 212-13.  NYNEX harmonized Klor's with its rule limiting per se analysis to horizontal boycotts:  "Although Klor's involved a threat made by a single powerful firm, it also involved a horizontal agreement among those threatened, namely, the appliance suppliers, to hurt a competitor of the retailer who made the threat."  525 U.S. at 135.  Cf. Northwest Stationers, 472 U.S. at 294 (per se liability applied to "efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.")(internal quotations omitted and emphasis added).

Spectators' relies on a theory of per se liability, but its arguments are inconsistent with NYNEX.  Spectators' contends:  "[A] group boycott formed for the simple purpose of eliminating a trader from the market, or putting a company out of business, is always illegal, regardless of who is involved in the conspiracy."  This pronouncement is simply contrary to NYNEX, where the Supreme Court rejected the argument that the defendants' motive of putting the plaintiff out of business brought the case within the per se rule. 525 U.S. at 137-38.  The Supreme Court warned that decisions to put a victim out of business are not always the stuff of antitrust

17

liability:  "To apply the _per se_ rule here--where the buyer's decision, though not made for competitive reasons, composes part of a regulatory fraud--would transform cases involving business behavior that is improper for various reasons, say, cases involving nepotism or _personal pique_, into treble-damages antitrust cases." _Id._ at 136-37 (emphasis supplied).  When Spectators' alleges that "the PGA Tour, driven to a fury by Mitchell's daring to sue it in a former case, set out to destroy [Spectators']," it is relying on the kind of vendetta that Justice Breyer stated would not give rise to antitrust liability.

Spectators' also hints that it has carried the burden of showing a horizontal agreement by alleging that the PGA is a "horizontal competitor" of Spectators'.  Involvement by one competitor of the victim does not alone make a horizontal restraint; there must be an agreement between more than one competitor at the same level to make a horizontal restraint.  _See_ _supra_ at 16.  The Supreme Court emphasized in _Sharp Electronics_ that "a restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement."  485 U.S. at 730 n.4.

However, despite its argument that a horizontal agreement is not necessary to establish a _per se_ case, Spectators' at least pleaded a horizontal conspiracy.  Its complaint alleged that the conspiracy or combination involved members of the American Golf Sponsors association, which included Anheuser-Busch, K-Mart, and NEC. The sponsors operate at the same level.  However, the only

18

evidence supporting NEC's participation in the conspiracy is Mitchell's testimony that he learned from NEC's Barbara Burdick that NEC had "succumbed" to PGA directives not to let Spectators' broadcast the NEC tournament.[3] Mitchell also testified that a representative of the K-Mart Greater Greensboro Open told him that the PGA would not allow Spectators' to broadcast PGA events. There is thus evidence of sponsors separately agreeing with the PGA, but no evidence of the competitors agreeing among themselves. This hub and spoke sort of proof does not establish a horizontal combination. See Royal Drug Co. v. Group Life and Health Ins. Co., 737 F.2d 1433, 1436-37 (5th Cir. 1984) (contracts entered separately between powerful buyer and competing sellers not horizontal combination without evidence of agreement among sellers); Brookins v. International Motor Contest Ass'n, 219 F.3d 849, 852 n.3 (8th Cir. 2000); Lomar Wholesale Groc., Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582, 590-95 (8th Cir. 1987) (distributor's separate conspiracies with several suppliers to deny a competing distributor access to the suppliers' products is not horizontal boycott); U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 594 (1st Cir. 1993) (exclusive dealing arrangements of HMO with many doctors are

---

[3]Mitchell's testimony about these conversations with sponsors appears to be vulnerable to hearsay objection. However, Anheuser-Busch does not object to it and Spectators' argues that it is admissible as co-conspirator hearsay. Because the district court did not rule on the admissibility of the evidence, we will not do so in the first instance, but will consider it part of the record for the sake of argument.

vertical, not horizontal, without showing that HMO was actually tool for doctors themselves).

Spectators' has therefore failed to establish a horizontal conspiracy subject to the _per se_ rule. We now turn to its allegations of a vertical conspiracy.[4] The district court held that Spectators' had not established a rule of reason case against Anheuser-Busch because it had not shown that Anheuser-Busch, alone, had market power and therefore could affect competition in any relevant market. Slip op. at 23 n.16. Of course, Spectators' alleges that PGA, not Anheuser-Busch, had market power. Apparently because the district court held there was no combination, it did not examine the market power of the alleged co-conspirator, the PGA. But after all, the reason for looking at market power is to determine whether the combination or conspiracy, not each individual conspirator, has the power to hurt competition in the relevant

---

[4]Although Spectators' devotes most of its brief to arguing that it showed a horizontal conspiracy that is _per se_ illegal, it also makes vertical boycott, rule of reason arguments that preserve the rule of reason issue for our review. Spectators' argues at length that its case is comparable to _Fineman v. Armstrong World Industries, Inc._, 980 F.2d 171 (3d Cir. 1992), and _MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc._, 62 F.3d 967 (7th Cir. 1995), vertical boycott cases involving coerced customers. Vertical boycotts are subject to the rule of reason. _See_ _NYNEX_, 525 U.S. at 138. Moreover, Spectators' argues that the district court should have considered the anticompetitive acts of the entire conspiracy, rather than those of Anheuser-Busch alone; at the same time, Spectators' also argues that proof of anticompetitive effects is irrelevant to a _per se_ case. Thus, by arguing the merits of an issue that is irrelevant to _per se_ analysis, Spectators' is evidently challenging the district court's rule of reason holding.

market.  See FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects.")(internal quotations omitted and emphasis added).  As the rule of reason theory was not addressed squarely below, we remand for consideration in the first instance by the district court of whether Spectators' has presented evidence of a vertical boycott constituting an unreasonable restraint of trade under the rule of reason.

### III.

Spectators' contends that the district court erred in entering judgment for Anheuser-Busch on Spectators's breach of contract claim.  The district court held that Spectators' had no claim for breach of the April 1993 contract because it failed to perform its obligation under that contract to broadcast the NEC tournament. Spectators' contends that its performance was excused by Anheuser-Busch.  In support, Spectators' points to the assertion in Mitchell's affidavit that "in late April or May 1993" Brunette of Anheuser-Busch "instructed [Spectators'] not to schedule any further golf events."  Spectators' interprets this ambiguous instruction from Brunette (schedule any further events after May?  after the end of the contract?) as proof that Anheuser-Busch repudiated the

21

contract.  However, the parties clearly did not act on the premise that the contract was called off in April or May 1993, because Spectators' broadcast the July 1993 Anheuser-Busch Classic.  Because the parties did not give any effect to the alleged repudiation by Brunette, it does not excuse Spectators's failure to perform months down the road.

Spectators' falls back on the November 1992 letter of intent, arguing that it is an enforceable contract in its own right.  The letter, from Dave Brunette, stated that Anheuser-Busch had reviewed Spectators's proposal and agreed to the broadcast of seven unspecified "Spectators Communications events in 1993."  There was no mention of price or of what advertising Anheuser-Busch was to receive.  Brunette asked Spectators' to contact him to discuss which events they would broadcast.  Brunette stated that he would work with Anheuser-Busch's legal department in the coming weeks to draft a contract with "the appropriate business points as well as representations, warranties, indemnities and other provisions customarily included in Anheuser-Busch agreements."  Eventually, Anheuser-Busch  produced such a contract, which is the April 1993 contract just discussed.  The 1993 agreement and the November 1992 letter both covered the 1993 year, but the terms of the two documents varied materially.  The contract was much longer and more detailed than the letter.  Moreover, the contract specified the broadcast of only three events, rather than the seven mentioned in the letter.  The 1993 contract contained a merger clause stating:

22

"This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, promises, understandings or representations, written or oral, in regard thereto."

Anheuser-Busch argues that the 1992 letter was only an agreement to agree and that the April 1993 agreement represented the fruits of further negotiation that resulted in a complete contract with a reduced broadcast schedule. Therefore, Anheuser-Busch argues, the merger clause in the 1993 agreement establishes that the formal contract superseded the 1992 letter. Spectators' responds that the 1993 contract did not supersede the 1992 letter because the two documents had different subject matters: the 1992 letter referred to seven broadcasts, and the 1993 contract referred to only three. Spectators's complaint and the record are devoid of any support for this theory; it did not perform seven broadcasts in 1993. It pleaded performance of a total of two, the first two in the 1993 contract. Because the subject matter of the 1992 letter was obviously subsumed in the 1993 formal contract, the district court properly granted summary judgment on this claim, and we need not deal with Spectators's many other arguments on this point.

IV.

The district court entered judgment against Spectators' on its claim under Texas law for civil conspiracy on the ground that Spectators' had not proved a meeting of the minds to put Spectators' out of business or any "unlawful overt acts" in furtherance of any

23

conspiracy. Spectators' argues that it showed Anheuser-Busch intended to put it out of business, but as the district court held, the evidence shows only that Anheuser-Busch had an intent to quit doing business with Spectators', rather than any design or thought of driving Spectators' out of business. Spectators' has therefore failed to prove civil conspiracy under Texas law, which requires that the conspirators share "a preconceived plan and unity of design and purpose." Schlumberger Well Surveying Corp. v. Nortex Oil and Gas Corp., 435 S.W.2d 854, 857 (Tex. 1969); accord Ward v. Sinclair, 804 S.W.2d 929, 931 (Tex. Ct. App. 1990).

***

We affirm the judgment of the district court as to the contract and civil conspiracy claims, but reverse as to the claim for conspiracy to violate section 1 of the Sherman Act.

24