Cody WHEELER, et al., Plaintiffs,

v.

PILGRIM'S PRIDE CORP. and Tyson Foods, Inc., Defendant.

No. 5:06–CV–004–DF.

United States District Court,
E.D. Texas,
Texarkana Division.

Sept. 28, 2007.

C. Paul Rogers, III, Bradley Carroll Weber, Christopher Michael Bass, Locke Liddell & Sapp, Dallas, TX, Justin Kurt Truelove, Kelly B. Tidwell, Patton Tidwell & Schroeder, LLP, Texarkana, TX, for Plaintiffs.

Jennifer Parker Ainsworth, Wilson Sheehy Knowles Robertson & Cornelius PC, Tyler, TX, Alexander Max Douglas Brauer, Clayton Edward Bailey, Mark David Taylor, Baker & McKenzie, Dallas, TX, John David Crisp, Crisp Boyd Poff, Texarkana, TX, Alan Wiseman, Christopher Macavoy, Eric Berman, Thomas Isaacson, Howrey LLP, Washington, DC, for Defendant.

### ORDER

DAVID FOLSOM, District Judge.

### (I) INTRODUCTION

Currently before the Court is Plaintiffs' Motion for Class Certification (Doc. No. 32). Also pending before the Court is Defendants' Joint Motion to Strike Plaintiffs' Expert Declarations (Doc. No. 81) and Plaintiffs' Motion to Strike the Declaration of David Sibley (Doc. No. 94). All relevant responsive briefing is before the Court and a hearing was held on February 8, 2007. For the reasons set forth below, all three motions are DENIED.

### (II) BACKGROUND

The present case involves a class action complaint brought by several chicken "growers" against two of the leading poultry producers in the country: Pilgrim's Pride Corporation (hereafter "Pilgrim") and Tyson Foods, Inc., Tyson Poultry, Inc., Tyson Farms of Texas, Inc., Tyson Chicken, Inc., and Hudson Foods, Inc., (collectively "Tyson"). Poultry dealers like Pilgrim and Tyson are commonly called "integrators" and form the backbone of the poultry business. Integrators are not only the primary buyers of production quality chickens, but are also the source of the chicks, feed, and medicine used by the growers. The type of chickens provided to the growers are known as "broilers." Within this structure, integrators contract with chicken farmers to assist them in raising chickens. These farmers are re-

ferred to as "growers" because they perform the essential function of growing the chicks into production quality birds. In the poultry business this is known as the "grow-out process." The typical contract between an integrator and a grower provides that the integrator will provide chicks, feed, medicine, and other supplies to the growers. The growers then use their labor and industry specific knowledge to grow out the broilers. The grow-out process typically takes less than two months for each flock. At that time the broilers are transported from the growers back to the integrator for processing.

Defendants compensate the growers based on the "tournament system."[1] The tournament system ranks the growers against each other based on the quality of their broilers, the proportion of broilers that survive the grow-out process, and the amount of feed and supplies used in growing out the birds. There are also other variables such as fuel allowances that affect compensation. Defendants then compensate the growers depending on how they rank against their peers by either adding or subtracting compensation from a base pay rate.

The operations of Pilgrim and Tyson include numerous complexes throughout the United States. Each complex typically has a pullet farm, a breeder farm, hatchery, feed mill, and processing plant. As noted, the broilers are sent back to the processing plant for meat production upon completion of the grow-out process. Due to the costs and other logistical concerns the growers are typically located within forty to fifty miles of the processing plant in the complex.

The named plaintiffs in this action are Cody Wheeler, Don Davis, Davey Williams, and Jerry "Butch" Ward. The first three are growers in Pilgrim's "Lufkin, Texas Complex." *See* Doc. No. 27 at 2. Plaintiff Ward, in turn, is a grower in Pilgrim's "NETEX Complex." *See id.* Although many of the potential class members are Tyson growers,

none of the named plaintiffs are growers for Tyson. Plaintiffs' Sixth Amended Complaint (hereafter "the complaint") states that Plaintiffs bring Sherman Act claims on their own behalf and on behalf of a similarly situated class of growers. *See* Doc. No. 27 at 8. The proposed class consists of both Pilgrim and Tyson growers throughout Northeast Texas and Arkansas. *See id.* Plaintiffs allege that Defendants have illegally made market allocation agreements and price-fixing agreements in violation of Section 1 of the Sherman Act of 1890. *See* Doc. No. 32 at 10. Specifically, Plaintiffs assert that Defendants have conspired to suppress grower compensation via exchange of confidential price information including the use of Agri–Stats[2] reports and agreeing to split the grower market between them by not contracting with the others' growers. *See id.* at 10–12. Plaintiffs assert that these acts improperly reduced competition and suppressed the base prices paid to growers. Plaintiffs seek to establish Defendants' civil liability for these acts under Section 4 of the Clayton Antitrust Act.

## (III) DISCUSSION

### (A) Whether Plaintiffs Have Standing to Maintain Their Class–Action Complaint

 In order to pursue their claims Plaintiffs must first demonstrate that they have standing to do so. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The constitutional minimum requirements of standing require a plaintiff to demonstrate (1) an injury in fact; (2) that the injury is fairly traceable to the alleged misconduct of the defendant; and (3) that a favorable decision is likely to redress the injury. *See id.* The Supreme Court has also made clear that an "injury in fact" must be "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or

---

**1.** The relevant briefing often refers to the grower compensation scheme as either a "tournament system" or an "incentive pay system." For purposes of class certification the schemes are functionally similar and the Court will refer to them as the "tournament system."

**2.** "Agri–Stats" refers to industry surveys compiled by Agri–Stats, Inc. *See* Doc. No. 32 at 11. Plaintiffs assert that Defendants used Agri–Stats to compile confidential pricing information without directly exchanging it. *See id.*

imminent, not conjectural or hypothetical." *See id.* (internal quotations omitted). The burden of demonstrating standing to invoke federal jurisdiction falls on the party seeking to establish these elements. *See id.* at 561, 112 S.Ct. 2130. "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *See id.*

■ Furthermore, "[i]nclusion of class action allegations in a complaint does not relieve a plaintiff of himself meeting the requirements for constitutional standing, even if the persons described in the class definition would have standing themselves to sue." *Brown v. Sibley,* 650 F.2d 760, 771 (5th Cir. 1981). "If the plaintiff has no standing individually, no case or controversy arises. This constitutional threshold must be met before any consideration of the typicality of claims or commonality of issues required for procedural reasons by FED.R.CIV.P. 23." *See id.*

Thus, as a threshold matter, the Court must determine whether Plaintiffs have standing to pursue their class claims. Defendants argue that Plaintiffs lack individual standing and therefore cannot pursue class certification. *See* Doc. No. 53 at 35 ("Because named Plaintiffs fail to demonstrate standing to pursue their individual claims, they also lack standing to pursue class claims."). Specifically, Defendants point out that none of the named class representatives have ever worked for Tyson. *See* Doc. No. 72 at 52. Furthermore, Pilgrim's notes that Plaintiffs lack proof of their allegations and therefore they lack standing. *See id.* Defendant Tyson also argues, essentially, that Plaintiffs lack standing because their circumstances are not typical of the overall class. *See* Doc. No. 72 at 53–54.

Plaintiffs first respond that Defendants' "standing" arguments are an improper attack on the merits. *See* Doc. No. 78 at 18. Instead, Plaintiffs argue that the antitrust statutes create a private cause of action which, in turn, gives them standing to pursue alleged violations. *See* Doc. No. 78 at 18–19. In response to Defendants' contentions, Plaintiffs specifically argue that they have standing to bring claims related to all relevant complexes because the scope of their alleged conspiracy concerns all of the complexes. *See, e.g.,* Doc. No. 78 at 20. Plaintiffs also respond that they have standing to bring claims on behalf of Tyson growers because Defendants are jointly and severally liable for their alleged conspiracy. *See* Doc. No. 78 at 24–25.

■ The Court agrees and finds that Plaintiffs have standing to pursue their class claims in this case. First, it is irrelevant that none of the named plaintiffs work for Tyson. Defendants rely heavily on *Brown v. Sibley.* In that case the Fifth Circuit states, "named plaintiffs are attempting to represent a class of which they are not members. A person simply cannot represent a class of which he is not a member." *Brown v. Sibley,* 650 F.2d 760, 771 (5th Cir.1981). Here, however, Plaintiffs are members of the proposed class. Central to this understanding is the fact that Plaintiffs allege a single conspiracy between Pilgrim and Tyson. Thus, even though Plaintiffs are growers for Pilgrim, it would be improper for the Court to distinguish the allegations against Tyson from those against Pilgrim. *See, e.g., In re Vitamins,* 209 F.R.D. at 265 (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)).

Additionally, Defendants are misplaced to the extent they argue Plaintiffs only have standing to pursue claims relating to the complexes that they are near. Plaintiffs properly point out that they do not allege separate price-fixing schemes for each complex at issue. *See, e.g.,* Doc. No. 78 at 20. Instead, Plaintiffs allege that Defendants engaged in a conspiracy to suppress compensation in all of the relevant complexes. Plaintiffs have also presented some evidence that supports their allegations. As a result, the Court finds that Plaintiffs have pled an injury in fact resulting from Defendants alleged antitrust violations. Furthermore, a favorable decision by this Court would redress Plaintiffs' injury. Consequently, the Court finds that Plaintiffs have standing to pursue their claims.

**(B) Whether Class Certification of Plaintiffs' Antitrust Claims is Warranted**

*(i) Applicable Law for Class Certification*

 Under Fifth Circuit law the party seeking certification bears the burden of establishing that the Rule 23 requirements are met. *See O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737–38 (5th Cir. 2003). It is also well established that this Court must "conduct a 'rigorous analysis of the Rule 23 prerequisites' before certifying a class." *Id.* at 738; *see also Bell Atlantic Corp. v. AT & T Corp.*, 339 F.3d 294, 301 (5th Cir.2003) (quoting *O'Sullivan*). This is especially true where, as here, a plaintiff seeks class certification under Rule 23(b)(3). *See Bell Atlantic*, 339 F.3d at 301 ("where the plaintiff seeks to certify a class under Rule 23(b)(3), the Rules 'invite [ ] a close look at the case before it is accepted as a class action.' ") (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). Furthermore, there is no secret recipe for certifying a class in an antitrust case. Instead, determining whether an antitrust case is suitable for class action treatment depends on "[t]he unique facts of each case." *See Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 316 (5th Cir. 1978).

Federal Rule of Civil Procedure 23 sets forth the requirements for maintaining a class action. *See* FED.R.CIV.P. 23. Rule 23(a) mandates that one or more members of a class may only sue on behalf of the class if four prerequisites are met. *See* FED.R.CIV.P. 23(a). Those prerequisites are:

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

*Id.*

 In addition to the prerequisites of Rule 23(a), a party seeking class certification must also satisfy one of the conditions in Rule 23(b) in order to maintain the action. *See Bell Atlantic*, 339 F.3d at 301. The two additional requirement created by Rule 23(b)(3) are "the burden of demonstrating both (1) that questions common to the class members predominate over questions affecting only individual members, and (2) that class resolution is superior to alternative methods for adjudication of the controversy." *See id.* "By inquiring into predominance, Rule 23(b)(3) thus tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* (internal quotations omitted).

 "Determining whether the plaintiffs can clear the predominance hurdle set by Rule 23(b)(3) also requires [district courts] to consider 'how a trial on the merits would be conducted if a class were certified.' " *See id.* at 302 (quoting *Sandwich Chef of Texas, Inc. v. Reliance Nat'l Ins. Indem. Co.*, 319 F.3d 205, 218 (5th Cir.2003)). Thus, this Court must "identify [ ] the substantive issues that will control the outcome, assess [ ] which issues will predominate, and then determin[e] whether the issues are common to the class." *See O'Sullivan*, 319 F.3d at 738. Only through this process can this Court "prevent [ ] the class from degenerating into a series of individual trials." *See id.*

*(ii) Elements of Antitrust Violations*

 As a general rule, "[a] claim under section 1 of the Sherman Act requires proof of three elements: that the defendant (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *Spectators' Communication Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir.2001). Plaintiffs allege that Defendants engaged in improper market allocation as well as an improper price fixing agreement. *See, e.g.*, Doc. No. 32 at 14. Citing to the ABA Model Jury Instructions, Plaintiffs acknowledge that their improper market allocation claim requires them to show: "(1) Pilgrim and Tyson agreed between themselves that they would not compete, or would significantly restrict competition, for each other's Growers; and (2) the agreement occurred in or affected interstate commerce."

*See* Doc. No. 32 at 14 (citing ABA Model Jury Instructions, B–39 to B–40). Likewise, to prevail on their price-fixing claim Plaintiffs must demonstrate: "(1) Pilgrim and Tyson agreed between themselves to exchange non-public information as to actual, current prices paid for the services of Growers; (2) the purpose or effect of this agreement was to fix or stabilize the prices for Grower services; (3) the fixing or stabilizing of the prices for Grower services occurred in or affected interstate commerce." *See id.* (citing ABA Model Jury Instructions, B–35). In addition to establishing these elements showing an antitrust violation, Plaintiffs must also satisfy the requisites of Section 4 of the Clayton Act. *See Bell Atlantic*, 339 F.3d at 294. To establish civil liability under the Clayton Act, Plaintiffs must demonstrate the they have been injured in their business or property by reason of the Sherman Act violations. *See id.* Thus, Plaintiffs must establish the alleged violation under the Sherman Act as well as "(1) establish that it was the defendant[s'] conduct that actually caused injury to [their] business or property, and (2) provide some indication of the amount of damages." *See id.* (quoting *Blue Bird Body*, 573 F.2d at 317).

*(iii) The Proposed Class*

The class which Plaintiffs seek to certify would include:

All persons who, at any time from July 1, 1998 to the present, have (a) raised broilers for [Pilgrim] at any of the following [Pilgrim] broiler complexes: De Queen/Nashville, Arkansas; Lufkin, Texas; NETEX; or El Dorado, Arkansas (collectively, the "Relevant [Pilgrim] Complexes"), or (b) raised broilers for Tyson at any of the following Tyson broiler complexes: Hope, Arkansas; Nashville, Arkansas; Grannis, Arkansas; Carthage, Texas; or Center, Texas (collectively, the "Relevant Tyson Complexes"). The following persons are excluded from the Class: (a) the presiding judge, (b) any other judge sitting in this matter, (c) other court personnel, (d) the parents, siblings, children, and grandchildren of the presiding judge or any other judge sitting in this case, (e) Defendants, (f) Defendants' officers and directors, and (g) the parents, siblings, children, and grandchildren of Defendant's officers and directors.

*See* Doc. No. 32 at 13.

In order to demonstrate class-wide impact and damages the Plaintiffs seek to directly and indirectly demonstrate an antitrust violation. In addition, Plaintiffs seek to show class-wide injury by demonstrating that Defendants suppressed the base price paid to growers. Plaintiffs argue that the suppressed base price universally harmed class members because their pay under the tournament system is linked to the base price. Plaintiffs also argue that the amount of damages for each class member can be easily assessed by adjusting their compensation to conform with what the base price would have been but for the Defendants' antitrust violation.

■ Importantly, this Court "may look past the pleadings to determine whether the requirements of rule 23 have been met." *See Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996). The Fifth Circuit has made clear, "[g]oing beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *See id.*

*(iv) Rule 23 Analysis*

(1) Rule 23(a)

As discussed above, the party seeking class certification bears the burden of demonstrating that the requirements of both Rule 23(a) and one of the conditions of Rule 23(b) are met. The first step in this analysis typically considers whether the four requirements of Rule 23(a) are satisfied. In the present case the record is complete as to these issues and each of the four elements is fully briefed. However, the Court may demur as to whether Plaintiffs have met their burden as to Rule 23(a) because, regardless, the Court finds that Plaintiffs have not met their burden as to the more demanding Rule 23(b)(3) requirements.

**(2) Rule 23(b)(3) and the Predominance Requirement**

Plaintiffs argue that this case is appropriate for class certification under Rule 23(b)(3). That rule requires "that questions common to the class members predominate over questions affecting only individual members." *See Bell Atlantic*, 339 F.3d at 301. Defendants argue that proof of injury and amount of damages is "so overwhelmingly individualized that common issues do not predominate." *See, e.g.*, Doc. No. 72 at 28. In evaluating this contention the Court first considers the well-settled principles which govern antitrust damages.

"A plaintiff must first prove the fact of antitrust damages, some 'element of actual damages caused by the defendant's violation of the antitrust laws.'" *See Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 206 (5th Cir.2000) (quoting *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 989 (5th Cir.1983)). "The term 'fact of damage' can be likened to the causation element in a negligence cause of action. The term means simply that the antitrust violation caused injury to the antitrust plaintiff." *See Blue Bird Body*, 573 F.2d at 317. A plaintiff must demonstrate, therefore, that the antitrust violation was a material cause of his alleged injury. *See id.* If the plaintiff is able to demonstrate fact of damages the courts then afford "a more relaxed burden of proof" as to determining the amount of damages. *See Eleven Line*, 213 F.3d at 207. Nonetheless, this more lenient view as to amount of damages is "limited by [this Court's] responsibility not to allow damages to be determined by 'guesswork' or 'speculation.'" *See id.* Instead, this Court "must at least insist upon a 'just and reasonable estimate of the damage based on relevant data.'" *See id.* With these principles in mind the Court evaluates Plaintiffs' contentions.

**(a) Fact of Damages**

Here, Plaintiffs seek to prove their injury by showing that Defendants' alleged antitrust violations suppressed the base price for the relevant markets. Dr. House explains that "all growers in the proposed class receive their compensation based upon the outcome of tournaments, and all growers in a particular tournament are paid the same base price." *See* Doc. No. 34, Tab G at 22. Dr. House goes on to explain that "changes in the average price paid for a single tournament affect the payment received among all growers who participate in the tournament." *See id.* Therefore, explains Dr. House, "to the extent that the average price paid for a specific tournament is set below competitive market prices, all growers participating in that tournament are injured." *See id.* Plaintiffs argue that this fact supports a finding that fact of damages can be shown via class-wide proof. On the other hand, Defendants argue that Plaintiffs are attempting to oversimplify their claim for damages because they assume that fact of damages automatically flows from the assumption that more competition would alleviate the alleged suppression of the base price. *See* Doc. No. 72 at 30. The Court agrees and finds that Plaintiffs' proposed method precludes a finding that class-wide evidence demonstrates "fact of damages."

First, it is clear that the tournament system differs from complex to complex. *See, e.g.*, Doc. No. 34, Tab G at 21–22. For example, the base price for compensation in one tournament could vary from the base price in a separate tournament. *See id.* For example, the base prices at some Tyson complexes was more than five times the base price from other complexes. *See* Doc. No. 121 at 12 (citing Tyson's exhibit 1 to the Feb. 8, 2007 hearing). Although Plaintiffs argue that this fact is overcome by simply looking at the overall percentage that Defendants' antitrust violations suppress all base prices, the Court is unpersuaded because Plaintiffs cannot prove with class-wide evidence that an increase in base price would make growers better off. Although Plaintiffs' expert claims the assessment and calculation of damages would be straightforward, Defendants' rebuttal expert demonstrates the difficulty of showing fact of damages with class-wide evidence. *See* Doc. No. 92, ex. 1 at 5–9.

Additionally, the Court finds that individualized proof of fact of damages will predominate because many of the complexes differ in

other respects. For example, Tyson points out that the Pilgrim plant in Dallas is beyond the competitive radius of the nearest Tyson plant. *See* Doc. No. 72 at 30. Thus, Tyson argues that even if there was a conspiracy the growers near the Dallas plant would not benefit from competition between Tyson and Pilgrim. *See id.* at 31. Although the Court need not pass judgment on this argument now, it is certainly true that determining whether Tyson's assertion is accurate would require an individualized analysis based on facts specific to that complex. *See id.* Individualized evidence will also be required in some complexes that include not only both Defendants, but outside integrators as well. For example, two other integrators operate within the relevant area. House of Raeford Farms operates a feed mill in Choudrant, Louisiana, which is closer to Pilgrim's El Dorado feed mill than any Tyson mill. Likewise, O.K. Industries operates a feed mill in Heavener, Oklahoma within the captive draw of Tyson's Broken Bow, Oklahoma feed mill. *See* Hr'g Tr. at 143. Although the Court discusses these facts in relation to the amount of damages, *infra,* they further exemplify the inability of proving fact of damages with class-wide evidence.

Finally, the Court notes Plaintiffs' argument that class members are harmed by the inability to switch from complex to complex or from integrator to integrator due to Defendants' alleged collusion. Defendants' expert, Dr. Aho, makes clear that due to geographic limitations some growers are unable to switch from one complex or company to another, while some growers may theoretically do so. *See* Doc. No. 53, ex. W at 8–9. The resulting conclusion is that Plaintiffs are unable to demonstrate this "fact of damages" without delving into the individualized traits of each complex and/or grower locale. The Fifth Circuit has made clear, "if the effect of class certification is to bring in thousands of possible claimants whose presence will in actuality require a multitude of mini-trials … then the justification for class certification is absent." *See Blue Bird Body,* 573 F.2d at 328. Because the fact finder will be forced to inquire into individualized evidence to determine whether Defendants antitrust violation caused injury to each class member as well

as the growers within each separate complex, the Court finds that class-wide issues do not predominate over individual ones. *See O'Sullivan,* 319 F.3d at 738.

### (b) Amount of Damages

Even if Plaintiffs were able to demonstrate fact of damages with class-wide proof they have not met their burden as to amount of damages. Although the courts generally afford plaintiffs "a more relaxed burden of proof" as to determining the amount of damages, *see Eleven Line,* 213 F.3d at 207, the Court still finds that this element is only susceptible to proof by individualized evidence.

■ "[T]he two most common methods of quantifying antitrust damages are the 'before and after' and 'yardstick' measures of lost profits." *Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc.,* 213 F.3d 198, 207 (5th Cir.2000). Nonetheless, the Fifth Circuit has also recognized that "a plaintiff may prove damages by a different measure tailored to the facts of the case, so long as the estimates and assumptions used rest on adequate data." *See id.* In the present case, Plaintiffs argue that Dr. House's damage model is tailored to the facts of this case and is supported by adequate data. *See* Doc. No. 78 at 67. The Court is unpersuaded.

■ Dr. House claims that his damage model consists of a "formulaic method of calculating economic damages." *See* Doc. No. 34, Tab G at 22. Dr. House's formula is as follows:

$$R = (P_B + A + E) \times Q$$

Dr. House explains that R represents the payment to each grower. *See* Doc. No. 34, Tab G at 22. He also explains that "$P_B$" is the base price in each respective tournament, "A" represents relevant allowances, and "E" represents adjustments for efficiency. The sum of these variables is then multiplied by "Q", the net pounds produced by each grower. *See id.*

Dr. House also explains that a competitive price can be calculated by considering the grower's opportunity cost for the relevant inputs coupled with estimates of actual aver-

age per pound costs. *See id.* at 23–27. For example, operating on the assumption that in a competitive market the growers "must earn enough to equal the opportunity cost of owned resources," Dr. House estimates the economic value of the necessary grower labor input based on what the growers could have made in the generalized labor market. *See* Doc. No. 34, Tab G at 24. This computation measures the growers' opportunity costs for raising chickens in terms of their labor. *See id.* Thus, looking that the median incomes for typical Arkansas residents Dr. House computes the average wages and amount of hours that the growers are entitled. *See id.* at 24–25. Dr. House asserts that this computation reveals the opportunity costs for the growers' time as managers and laborers. *See id.* Dr. House also computes these costs for several other resources in order to calculate a per-pound opportunity cost for several input factors including land, invested capital, and owner/manager time. *See id.* at 24–27. In another example, Dr. House computes the "actual average per pound costs" based on the Alabama Reports data. *See id.* Then, Dr. House adds in his per pound estimates of opportunity costs for inputs in order to compute the total cost of production per pound in a competitive market. *See id.* The but-for price is then based on these estimates of opportunity costs. *See id.* at 27.

Under Plaintiffs' theory, the Defendants have improperly depressed the base price $P_B$. *See* Doc. No. 34, Tab G at 22. Plaintiffs assert that but for the alleged antitrust violation the base price, $P_B$, would have been higher. *See id.* At issue now, however, is not whether the class was injured, but whether the amount of each class member's damages can be justly and reasonably estimated. *See Bell Atlantic,* 339 F.3d at 304.

Notwithstanding Dr. House's explanation, the Court finds that his damage model is insufficient given the facts of this case. First of all, the ability to switch as well as the cost of switching varies from complex to complex. *See* Doc. No. 72, ex. 1 at 5. As Tyson points out, switching inherently alters the tournament pay system because it changes the composition of growers within the tournament. As discussed above, there are also inherent costs associated with switching. Plaintiffs counsel concedes that their damage model does not take into account these costs or the fact that growers would have done so. *See* Hr'g Tr. at 152, II.14–17. The fact remains that the costs of shifting differ from complex to complex and even from grower to grower. As a result, the amount of damages could not be computed with a simple formulaic method. *See Eleven Line,* 213 F.3d at 207 (noting that the more lenient view as to amount of damages at the class certification stage is "limited by [a court's] responsibility not to allow damages to be determined by 'guesswork' or 'speculation'" and that courts "must at least insist upon a 'just and reasonable estimate of the damage based on relevant data'").

Furthermore, Dr. House's model, which is partly based on Dr. Taylor's finding, fails to take into consideration several relevant factors. Instead, the damage model is based heavily on assumptions. In *Eleven Line* the Fifth Circuit found that a damage model was not "tailored to the facts of the case" and rested on inadequate estimates and assumptions. *See Eleven Line,* 213 F.3d at 207. The Fifth Circuit characterized the damages evidence in that case as "impermissibly consist[ing] of estimates based on assumptions that are based on estimate and assumptions." *See id.* The Court finds that Dr. House's assumptions in this case oversimplify the damage methodology and ignore the fact that individualized proof will be needed to show the damages of each class member within each grower complex. For example, Dr. House fails to consider the fact that various growers operate under differing contracts. In fact, Plaintiffs Wheeler and Williams have negotiated contracts that differ from other growers. *See* Doc. No. 53, ex. W at 8. Consequently, the amount of damages cannot be reasonably calculated without considering individualized proof related to each grower's contract.

Dr. House also assumes that the data utilized in his damage methodology is indicative of the class members' damages. Specifically, Plaintiffs' model utilizes data from the Alabama Farm Business Report to calculate broiler production costs. *See* Doc. No. 81,

ex. 1 at 12. However, the Court cannot conclude that those reports are representative of either the markets at issue here or the costs of the potential class members. In fact, Dr. Taylor concedes that he has not made an attempt to sample the relevant market or any members of the class. *See, e.g.,* Doc. No. 67, ex. U (part 1) at 9–12. Although noting that the principal purpose of his expert report was to demonstrate his damage methodology, Dr. Taylor also noted that he "did not seek all of the best information, as far as facts, to demonstrate that methodology." *See id.* at 11. As a result, the Court has no basis to believe that Plaintiffs' methodology will accurately reflect class-wide injury without considering evidence specific to each complex.

Further, Dr. Taylor's explanation that the Alabama Reports were the only available data "assembled by objective sources," *see* Doc. No. 81, ex. 1 at 12, carries little weight in light of the fact that Plaintiffs make no attempt to compare that data to the relevant markets. Therefore, the Court cannot conclude that the Plaintiffs have met their burden of showing fact of damages are provable with class-wide evidence. *See Castano,* 84 F.3d at 742 ("Given the plaintiffs' burden, a court cannot rely on assurances of counsel that any problems with predominance or superiority can be overcome."); *see also* Doc. No. 32, Tab F at 3 (explaining Dr. Taylor's conclusions are preliminary and subject to change as discovery in this case develops further).

Additionally, adequate estimation of actual damages suffered is not possible without consideration of varied and individualized proof related to each complex at issue. *Cf. Bell Atlantic,* 339 F.3d at 304. For example, Dr. Taylor assumes that Pilgrim's Pride and Tyson control 100% of the market in the relevant geographic area. *See* Doc. No. 81, ex. 1 at 8. As Defendants point out, this statement is not entirely true. In fact, two other integrators operate within the relevant area. House of Raeford Farms operates a feed mill in Choudrant, Louisiana. This mill is closer to Pilgrim's El Dorado feed mill than is Tyson's mill. In addition, the evidence before the Court demonstrates that this feed mill is very near the captive draw of the El Dorado feed mill. *See* Tyson's Ex. 5 to Class Certification Hr'g at 3. However, House of Raeford is not an alleged conspirator and Dr. Taylor cannot assume that there is no outside influence on competition within that subsection of the relevant market. By the same token, O.K. Industries operates a feed mill in Heavener, Oklahoma near Tyson's Broken Bow, Oklahoma feed mill. *See id.* The evidence before the Court shows that this feed mill is actually within the captive draw of Tyson's Grannis Complex. *See id.*

Each complex differs in other aspects as well. As Dr. Aho points out fuel supplements differ for each complex and condemnation differs from grower to grower. *See* Doc. No. 53, ex. W at 9. Individual computation of damages is also inevitable because different compensation schemes are utilized for conventional houses, tunnel-ventilated houses, and premium houses. *See* Doc. No. 72, ex. 3 at 9. The Court finds it fairly evident that the amount of damages will only be provable by considering the distinctions between the different complexes. Such a scenario would require a multitude of mini-trials and precludes class-certification. *See Bell Atlantic,* 339 F.3d at 307 ("where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate."). Thus, the Court cannot conclude that class-wide evidence can show injury to all class members simply due to their inherently different circumstances.

## (V) CONCLUSION

For the reasons set forth above the Court ORDERS that Plaintiffs' Motion for Class Certification (Doc. No. 32) is DENIED.

Relatedly, the expert opinions of Dr. House and Dr. Taylor are insufficient to support class certification for the reasons set forth above. Given this fact, the Court need not consider Defendants' objections to their declarations. As a result, Defendants' Joint Motion to Strike Plaintiffs' Expert Declarations (Doc. No. 81) is DENIED.

The Court has also considered Plaintiffs' Motion to Strike the Declaration of David

Sibley (Doc. No. 94). To the extent material to this order the Court finds that Sibley's declaration was properly submitted as a rebuttal expert report. As a result, Plaintiffs' motion is DENIED.